UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | |
| | ) | |
| DEBBIE L. GUNSTEEN, | ) | Bankruptcy No.  11 B 10055 |
| Debtor, | ) | |
| _____ | ) | |
| HARRIS N.A. as successor by merger to | ) | |
| HARRIS TRUST AND SAVINGS BANK, | ) | Adversary No.  11 A 01359 |
| Plaintiff | ) | |
| v. | ) | |
| DEBBIE GUNSTEEN, | ) | |
| Defendant | ) | |

## POST-TRIAL FINDINGS OF FACT AND CONCLUSION OF LAW

Following trial and post-trial argument, the following Findings of Fact and Conclusions

of Law are made and entered. Pursuant thereto, Judgment will enter in favor of Defendant and

against Plaintiff.

## FINDINGS OF FACT

### The Parties

1.     The Plaintiff Harris, N.A. n/k/a BMO Harris Bank ("Bank") is a national

banking association existing under the laws of the State of Illinois, with its principal place of

business located at 111 West Monroe Street, Chicago, Illinois. (Stip. ¶ 1.)

2.     Defendant Debbie Gunsteen ("Gunsteen") is an individual residing at 201

Wilcox Drive, Bartlett, Illinois 60103 and is the Debtor in a related bankruptcy case. (Stip.

¶ 2.)

3.     At all relevant times, Gunsteen was the secretary, vice-president, and a co-owner of Magun Electric. (Stip. ¶ 3.) Gunsteen has held these positions for at least 18 years. (PX 8.)

**The Debt**

4.     On October 16, 2008, the Bank made a loan to Magun Electric in the maximum principal amount of $1,500,000 ("Loan"), which was evidenced by a Business Loan Agreement and Promissory Note ("Note") executed by Magun Electric, with the maturity date of October 16, 2009. (Stip. ¶ 4; JX 1; JX 2.)

5.     In conjunction with the Note, Magun Electric executed a Commercial Security Agreement giving the Bank a security interest in various collateral, including Magun Electric's accounts receivable.  (PX 16; Tr. 23:25-24:22; Tr. 278:23-279:6.)

6.     Simultaneously with execution of the Note by Magun Electric, on or about October 16, 2008, Gunsteen executed and delivered to the Bank a Commercial Guaranty, in which Gunsteen unconditionally and absolutely guaranteed personally the full and punctual satisfaction of Magun Electric's indebtedness to the Bank (the "Gunsteen Guaranty"). (Stip. ¶ 5; JX 3.)

7.     The Gunsteen Guaranty was a condition of extending credit to Magun Electric. (Tr. 126:11-14.)

8.     A Co-Guarantor, Patricia Maher ("Co-Guarantor'), also provided a Commercial Guaranty to the Bank regarding Magun Electric's Note. (Stip. ¶ 6.)

9.      Based on the foregoing documents, the primary source of repayment of the

Loan was the assets of Magun Electric, including its accounts receivable, and the secondary

source of repayment was the personal resources of the guarantors. (Tr. 124:7-16.)

**The 2008 Financial Statement**

10.     To support Magun Electric's application for a loan and in support of her

Guaranty, Gunsteen and her husband, Daniel Gunsteen (collectively "Gunsteens"), provided

the Bank with their financial statement dated July 14, 2008 ("2008 Financial Statement"). (JX

4; Stip. ¶ 4.)

11.     The assets disclosed on the 2008 Financial Statement were a material

consideration in the Bank's decision whether to grant the original loan.

12.     Because the guarantees executed by Gunsteen and Maher were the second

source of repayment of the Loan, Gunsteen's net worth, as reflected in the 2008 Personal

Financial Statement, was relevant to the Bank. (Tr.123:25-124:6; Tr.185:8-18.)

13.     In the 2008 Financial Statement, Gunsteen agreed to the following:

The information contained in this statement is provided for the purpose of
obtaining, or maintaining credit with you [the Bank] on behalf of the
undersigned, or persons, firms, or corporations in whose behalf the undersigned
may either severally or jointly with others, execute a guaranty in your [the
Bank's] favor. *Each undersigned understands that you [the Bank] are relying
on the information provided herein (including the designation made as to
ownership of property) in deciding to grant or continue credit.* Each
undersigned represents and warrants that THE INFORMATION PROVIDED IS
TRUE AND COMPLETE and that you [the Bank] may consider this statement
as continuing to be true and correct until a written notice of a change is given to
you [the Bank] by the undersigned. You [the Bank] are authorized to make all
inquiries you deem necessary to verify the accuracy of the statements  made
herein, and to determine  my/our credit worthiness. You [the Bank] are
authorized to answer questions about your [the Bank's] credit experience with

me/us. (JX 4 (all caps emphasis in original; bold, underline and italics emphasis added).)

14.     Gunsteen handwrote all portions of the 2008 Financial Statement. (Stip. ¶ 7; JX 4.)

15.     Gunsteen admitted at trial that she signed her husband's name on the second page of the 2008 Financial Statement. (JX4; Tr. 145:13-19; Tr. 327:14-25.)

16.     Neither Gunsteen nor her husband told the Bank that Gunsteen signed her husband's name. (Tr. 145:13-19; Tr. 327:14-25.)  The Bank was not aware that Daniel Gunsteen did not sign the 2008 Financial Statement.  (Tr. 26:23-25.)

17.     In the 2008 Financial Statement, Gunsteen listed as one of her assets a parcel of real estate identified as "848 Norwich Ct." (Stip. ¶ 8; JX 4.)

18.     The 848 Norwich Ct. property is located in Nekoosa, Adams County, Wisconsin and has been used by the Gunsteen family as a vacation property (hereinafter referred to as the "Vacation Property"). (Stip. ¶ 9.)

19.     Gunsteen represented to the Bank in the 2008 Financial Statement that the Vacation Property had a value of $425,000.  (Stip. ¶ 8; JX 4.)Gunsteen also represented therein that the Vacation Property had no debt against it and was unencumbered by any mortgage. (Stip. ¶ 10; JX 4.) According to the 2008 Financial Statement, the Vacation Property was her single most valuable asset. (JX 4.)

20.     Before she gave the 2008 Financial Statement to the Bank, the Gunsteens had agreed orally to sell and transfer title in the Vacation Property to their children for $105,000. (Tr. 139:13-140:7; Tr. 332:16-333:4; Tr. 333:9-22; Tr. 334:4-9.)

- 4 -

21.     On August 1, 2007, Debbie and Daniel Gunsteen's children paid Gunsteen the sum of $75,000 as a first installment toward their purchase of the Vacation Property. (PX 17; Tr. 137:10-138:1; Tr. 332:16-20; Tr. 333:6-8.)

22.     On September 30, 2007, Debbie and Daniel Gunsteen's children paid Gunsteen another $20,000 as a second installment for their purchase of the Vacation Property. (PX 18; Tr. 138:15-139:1; Tr. 333:9-22.)

23.     By mid-2008, Debbie and Daniel Gunsteen received the last payment of $10,000 from their children for the Vacation Property. (Tr. 141:8-143:19; Tr. 333:23 -25; Tr. 334:1-3.)

24.     Thus, prior to July 14, 2008, the date Gunsteen executed and delivered the 2008 Financial Statement to the Bank, the Gunsteens had agreed (apparently by oral agreement, no contract having been offered in evidence) to sell the Vacation Property to their children and had been paid the agreed amount. (Tr. 332:16-333:4; Tr. 334:4-9; Tr. 336:11-17.)

25.     However, when the Vacation Property was listed on the 2008 Financial Statement, the Gunsteens still owned it and the representation of such ownership at that time was true.

26.     When Gunsteens provided the 2008 Financial Statement to the Bank, they had already received all of the money that they were going to receive from their children for the Vacation Property (Tr. 144:25 -146:3; Tr. 332:16-334:9).  However, they had not prior to giving that Statement deeded the Property, nor had any mortgage or lien been placed on the Vacation Property.

27.     The Gunsteens was aware that the Bank was relying on the 2008 Financial Statement to determine whether to "grant or continue credit." (JX 4 (Disclosure Statement).)

28.     However, when Gunsteen included the Vacation Property on the 2008 Financial Statement (JX 4), not only was the representation that they owned it still truthful, but also the oral agreement for future transfer of the Property did not diminish the market value of the Vacation Property represented on that Statement because the Gunsteeens still owned the Property when the 2008 transaction was executed, free of any mortgage or any rights of the children established by the evidence here.

29.     The Bank used and relied on the 2008 Financial Statement to analyze Gunsteen's capacity to repay the Loan, as well as to gauge the financial condition of Magun Electric by inputting the information into a personal financial guaranty worksheet that the Bank then used to approve the Loan. (Tr. 63:16-64:16; *see infra* 58-61.)  However, the Bank did not request a mortgage or lien on the Vacation Property, and when it was executed and delivered the 2008 Financial Statement did not falsely state the Gunsteen assets.  Because the Bank did not require or record a lien to preserve the Property value as a potential collectible source, the weight that it gave to it appears to have been limited.

30.     After reviewing the 2008 Financial Statement, the Bank granted Magun Electric a line of credit for an amount not to exceed $1.5 million.  (JX 1; JX 2.)

31.     On February 12, 2009, four months after the Bank made the 2008 Loan, Gunsteen and her husband legally deeded the Vacation Property to Christopher Gunsteen, their son, and Diana Gunsteen, their daughter-in-law. (Stip. ¶ 14; JX 5.) Neither at that time nor at

any time thereafter, did they receive any further payment from their children for the Vacation

Property. (Tr. 136:21 137:1.)

## The 2009 Financial Statement

32.     Shortly before the Loan was to mature in October 2009, representatives of the

Bank, Magun Electric, Gunsteen, and the Co-Guarantor entered into discussions regarding

renewal of the Loan. (Stip. 11; PX2; PX 3.)

33.     Before the Bank would agree to modify and extend the Loan, the Bank asked

that Gunsteen and her husband provide an updated personal financial statement, including

listing of any real estate that they owned.  (Stip. ¶ 12; PX 2; PX 3; Tr. 37:1-9.)

34.     The Bank required an updated financial statement so as to ascertain the strength

of the Gunsteens as guarantors.  (Tr. 37:15-38:4.)

35.     Mrs. Gunsteen submitted to the Bank an updated financial statement dated

October 16, 2009 (the "2009 Financial Statement"). (Stip. ¶ 13; PX 1.)

36.     Mrs. Gunsteen again agreed to the following disclosure in the 2009 Financial

Statement:

> The information contained in this statement is provided for the purpose of
> obtaining, or maintaining credit with you [the Bank] on behalf of the
> undersigned, or persons, firms, or corporations in whose behalf the undersigned
> may either severally or jointly with others, execute a guaranty in your [the
> Bank's] favor. *Each undersigned understands that you [the Bank] are relying on
> the information provided herein (including the designation made as to
> ownership of property) in deciding to grant or continue credit* Each
> undersigned represents and warrants that THE INFORMATION PROVIDED IS
> TRUE AND COMPLETE and that you [the Bank] may consider this statement
> as continuing to be true and correct until a written notice of a change is given to
> you [the Bank] by the undersigned. You [the Bank] are authorized to make all
> inquiries you deem necessary to verify the accuracy of the statements made
> herein, and to determine my/our credit worthiness. You [the Bank] are

authorized to answer questions about your [the Bank's] credit experience with me/us. (PX 1 (all caps emphasis in original; underline and italics emphasis added).)

37.     Without advising the Bank and without indicating that she was signing on behalf of her husband, Gunsteen has since admitted that she signed the name of her husband on the 2009 Financial Statement, (PX 1; Tr. 145:13-19; Tr. 324:8 -23; Tr. 39:14-20) apparently with his consent but not with the Bank's consent.

38.     James Hayes, the Bank's forensic document examination expert, confirmed that Debbie Gunsteen signed the name of "Daniel Gunsteen," along with writing his birthdate and social security number on the 2009 Financial Statement. (PX 19; Tr. 240:18-241:1.)

39.     Hayes also gave testimony that the two signatures bore characteristics indicating that they were signed by two different writers. The pen pressure, size, and letter movements between the signatures were all different.[1]  Plaintiff argues that this inferred a deceptive intent by Defendant.

---

[1] Hayes testified that:

(a)     the letter "D" in Daniel was significantly higher than the "D" in Debbie;

(b)     the letter "G" in Daniel Gunsteen spread out at the bottom, whereas the "G" in Debbie Gunsteen was more parallel;

(c)     the letters "s" and "t" were connected differently. In Debbie's name, the connecting stroke went from the "s" to the top of the "t," whereas in Daniel's name the "s" connected to the "t" at the baseline;

(d)     the letter "t" was crossed differently.  In Debbie's name, the "t" was crossed by using one continuous movement from the "n" at the end of the word. However, the "t" in Daniel's signature was a separate, distinct movement that was not connected to any other letter; and

(e)     the format for the birthdates was different. Debbie's birthdate used backslashes, while Daniel's birthdate used dashes. *(See PX 19; Tr. 241:4-242:15.)*

40.    Hayes further opined that by using alternative handwriting styles for her and her husband's signature and information, Gunsteen demonstrated that she was a skilled writer able to manipulate her handwriting so that it seemed as though someone besides herself wrote it.

41.    The Vacation Property was listed on the second page of the 2009 Financial Statement as one of the assets that the Gunsteens owned and valued at $425,000. (PX 1.)

42.    However, as earlier found (Findings No. 31), the Gunsteens did not own the Vacation Property in October of 2009. (JX 5.)

43.    As earlier noted, over a year earlier, the Gunsteens had agreed to sell the Vacation Property to their children for $105,000. *(See supra* at ¶¶ 20-23.)

44.    On February 12, 2009, Gunsteen and her husband then legally deeded the Vacation Property to Christopher Gunsteen and Diana Gunsteen. (Stip. ¶ 14; JX 5.)

45.    If Gunsteen had made the entry on the second page of PX 1 valuing the Property purportedly owned by her and her husband at $425,000 in the 2009 Financial Statement, that would have been false, because the Property had been deeded to family members before the 2009 loan extension.

46.    However, one crucial issue in this case is whether Gunsteen or someone else made the entry showing continued ownership of the Vacation Property. Gunsteen testified that she did not write the "848 Norwich Ct" entry, and Hayes, Plaintiff's forensic document expert, could not confirm or eliminate Gunsteen as the author of the "848 Norwich Ct" entry on the 2009 Financial Statement. (PX 19; Tr. 225:19-24.)

47.    Hayes testified that he could not eliminate her as the writer because (a) there were several similarities in letter style between the "848 Norwich Ct" entry and Gunsteen's

handwriting exemplars; and (b) her handwriting skill level meant she had the ability to write the entry. (PX 19; Tr. 226:9-227:24.)[2]

48.     There were also dissimilarities between the "848 Norwich Ct" entry and Gunsteen's exemplars, such as the numerals eight and zero being written differently on several occasions (PX 19; Tr. 235:12-236:4). Hayes opined that because of these dissimilarities he cannot confirm that she wrote the entry.  (Tr. 236:5-8).

49.     Hayes further opined that the lack of uniformity in writing that he found actually makes it less likely that a third party tried to imitate Mrs Gunsteen's handwriting, because an imitator usually tries to make his/her writing as similar as possible to the person's writing he is trying to imitate. (Tr. 235:25-236:8.)

50.     He further opined that these dissimilarities could actually indicate intentional distortion by Gunsteen.  (Tr. 232:15-234:2; Tr. 235:1-11; Tr. 236:5-8.)  Intentional distortion means that someone is trying to make the writing look like something other than their own. (Tr. 236:24-237:2.)  His opinion in this regard was not supported by particular scientific standards of his profession.  Rather, his opinion as based on his experience, which he suggested established that in an effort to misrepresent her continued ownership of the Vacation Property, Mrs. Gunsteen tried to make her handwriting on the line in issue look different from her other handwriting.  He thereby impliedly sought to negate the alternative possible

---

[2] He gave these examples: The letters ''N,'' "O," "R," "W," "I," "C-H," and "C-T'' are similar to the exemplars that Gunsteen submitted, including the 2008 Financial Statement. (Tr. 228:22-229:10.) Also, the "Dan and Deb" section of the "848 Norwich Ct" entry in the 2009 Financial Statement has similar proportionally-sized letters as the "Dan and Deb" section of the 2008 Financial Statement and the preceding "201 Wilcox Dr." entry in the 2009 Financial Statement.  Finally, in both the 2009 and 2008 Financial Statements, the "E" of"Deb" is made with a rounded format as opposed to a block-style format. (Tr. 229:11-19; Tr. 230:22-231:9.)

inference that someone at the Bank had filled in the page 2 line in issue. His opinion about

her supposed motive must be treated as subjective speculation, not an expert opinion.

51. Hayes further opined that intentional distortion by Gunsteen is a possibility in

this case. (PX 19; Tr. 237:3-23.) He said that the characteristics that support a finding of

intentional distortion include alterations in slant, alterations in size, unusual letter forms, and

lack of consistency. These characteristics are present in the "848 Norwich Ct" entry (Tr.

237:22-239:4).[3]

52. However, the latter testimony was, again, subjective speculation on intent of

writer for the items referred to rather than based upon forensic handwriting expertise. There

was no reason for or motive shown for Mrs. Gunsteen to have intentionally distorted the one

line in issue on the second page of the form. The foregoing inferences drawn by Hayes were

merely his speculative conclusions based on certain differences and similarities (Findings Nos.

47, 48, 49, 50, and 51.) However, he could not and did not conclude that she was the writer

of that line. Moreover, he also testified that the entry in issue was written in different ink

from the rest of the document entries that were entirely written by Mrs. Gunsteen. His

subjective opinion suggested that if she drafted the line 2 entry on the form used to persuade

--------------------------------------------------

[3] Mr. Hayes noted that:

(a)     First, the numeral eight is made with a left-handed slant as opposed to Gunsteen's typical right-handed slant, but the other letters and numerals are still made with a right-handed slant (Tr. 239:5-240:1);

(b)     Second, the size of the entire "848 Norwich Ct" entry is smaller than the entry directly above it on the 2009 Financial Statement (Tr. 240:2-10); and

(c)     Third, there is a lack of consistency in the formation of the numeral eight and zero and whether the characters are made with a right-handed slant or left-handed slant (Tr. 238:16-239:4; Tr. 239:19-240:1).

approval of a loan extension, that she did so with a deliberately distorted writing in different

ink so as to deceive the Bank. He thereby rejected impliedly the inference that the different

handwriting in different ink was written by another person, and he certainly did not make

sense with his speculation that Gunsteen wrote strangely so as to be deceptive.

53.    Bank employees denied that they added the "848 Norwich Ct" entry to the 2009

Financial Statement, or otherwise altered the 2009 Financial Statement. (Tr. 40:1-11; Tr.

118:12-119:1; Tr. 184:18-23.)

54.    Neither Gunsteen nor her husband - the only two defense witnesses - identified

anyone at the Bank who altered the 2009 Financial Statement that she delivered to the Bank.

(Tr. 162:9-15, 24; Tr. 326:7-17.)

55.    It must be found that Gunsteen had a possible incentive to misrepresent her

assets in 2009 since late in 2008 or early in 2009, Magun Electric and Gunsteen had been

suffering serious financial difficulties. (PX 6; PX 8; Tr. 190:11-17.)[4]

---

[4] (a)    Due to the downturn in the construction industry, Magun Electric's ineligible accounts
receivable (contractual payments due from customers) rose from $1,083,579 as of November
30, 2008 to $1,667,033 as of October 15, 2009. (PX 11; Tr. 32:10-22; Tr. 33:12-35:1.)

(b)    Magun Electric's Profit & Loss Statements show that the company's total income
decreased from $7.7 million in August 2008 to $4.9 million in August 2009 and net
income decreased from $60,444.27 in August 2008 to $2,223.15 in August 2009. (PX
10; Tr. 35:4-36:12.)

(c)    Magun Electric's accounts payable (contractual payments due to vendors) had increased
to 104 days past due, which is significant as Magun Electric's vendors could possibly
force the business to shut down via an involuntary bankruptcy for its failure to pay these
debts. (Tr. 119:24- 120:24; PX 6, PX 7; PX8.)

(d)    Magun Electric stopped paying its officers their salaries, including Gunsteen's, in 2009.
(Compare PX 14 with PX 15; PX 8; Tr. 61:16-23.)

(e)    Gunsteen's credit report showed delinquencies in making credit card and utility
payments. (PX 8; Tr. 59:15-25; Tr. 121:3-122:10; Tr.186:13-187:4.)

56.    The information in her 2008 Financial Statement regarding the Vacation Property was asserted to be false because Gunsteen and her husband had orally agreed by mid-2008 to sell the Vacation Property to their children for up to $105,000. It is argued that before submitting the 2008 Financial Statement they knew that they would never receive $425,000 for that property and so the value on that Statement was said to be misrepresented. That is argued despite the fact they had not conveyed title or any mortgage or other interest in the Property before signing that Statement and there was no evidence showing reduction in the value of the Property because of the promise of its future sale to family members. Therefore, the 2008 Statement did not show lack of veracity as to value of assets represented.

57.    Given that (1) Gunsteen had motive, as Magun Electric and Gunsteen were under financial stress in 2009; (2) there was speculation as to supposed characteristics of intentional distortion by Gunsteen regarding the "848 Norwich Ct" entry in the 2009 Financial Statement; (3) Gunsteen signed her husband's name; (4) Mike Kowall (Bank relationship manager) Dave Wymer (a business sales manager at the Bank), and Elizabeth Williams (a concurrence officer at the Bank) - the three Bank employees involved in the renewal of the Loan - testified that no one at the Bank altered the 2009 Financial Statement; (6) the Gunsteens did not identify anyone at the Bank who altered the 2009 Financial Statement; and (7) the Bank had no motive to alter the 2009 Financial Statement, it is asserted by Plaintiff that a preponderance of the evidence showed that Gunsteen wrote the "848 Norwich Ct" entry on the 2009 Financial Statement.

However, since Gunsteen testified and credibly denied writing that Page 2 entry; the handwriting expert could not identify her as the writer; the entry was written in different ink;

and, as discussed below page 1 of the Statement, gave truthful information about the Gunsteens' assets, it has not been proven by preponderance of the evidence that she wrote the entry.

58.   When Gunsteen provided the 2009 Financial Statement to the Bank, the Bank had not yet decided whether to renew Magun Electric's Loan. (PX 4; PX 7; Tr. 54:15-20.) The Bank used on the 2009 Financial Statement, including the representation that Gunsteen owned the Vacation Property, to analyze and determine whether to renew the Magun Electric Loan. (PX 1, PX5; PX6; Tr. 46:11-18; Tr. 50:4-7.)

59.   Because the Vacation Property was included on the second page of the 2009 Financial Statement, the Bank's relationship manager, Mike Kowall, identified the Vacation Property, along with its value of $425,000, as one of Gunsteen's assets on a worksheet analyzing her financial status. (PX 5; Tr. 49:8-50:7.)  By including the Vacation Property in the worksheet, Kowall assumed Gunsteen had assets worth $914,000. (PX 5.)

60.   In approving the loan, both Dave Wymer, a business sales manager at the Bank, and Elizabeth Williams, a concurrence officer at the Bank, testified that they relied on the personal financial worksheet prepared by Kowall, which included the Vacation Property. (Tr. 126:16-22; Tr. 127:25 -128:4; Tr. 184:24-185:7.)

61.   The overall personal financial condition of Gunsteen as a guarantor, as reflected in her personal financial worksheet, was important to the Bank in understanding whether Gunsteen continued to have the capacity to be a possible source of repayment and whether Magun Electric was having financial difficulties as well. (Tr. 123:25-124:6; Tr. 185:8-16.)

62.    The Bank did not know when renewing Loan in 2009 that Gunsteen no longer owned the Vacation Property. (Tr. 44:20-25.)

63.    Plaintiff argues that if the Bank officers who approved the loan renewal had known Gunsteen no longer owned the Vacation Property, the Bank would not have included the Vacation Property on the worksheet and her assets would have been reduced by $425,000, which would have negatively affected her net worth and debt to income ratio. This would have made her a much weaker guarantor in the Bank's underwriting of the Loan. (Tr. 45:1-11; Tr. 53:9-23; Tr. 188:4-11.) They testified that had the Bank known that Gunsteen did not own the Vacation Property, the Bank at the very least would have questioned Gunsteen regarding the missing asset, and what happened with any proceeds from any liquidation of that asset. (Tr. 127:6-24.) But that argument disregards the first page of the 2009 Financial Statement which accurately showed that Gunsteens' assets did not include the Vacation home.  As shown below, the Bank officers disregarded that page and did not inquire as to the discrepancy.

64.    Ultimately, the Bank approved a 105-day renewal of the Loan in December 2009. (PX 6; PX 7; Tr. 55:2-56:19; Tr. 128:5 -11; Tr. 192:15 -19; Tr. 194:2-10; Tr. 194:19-24.)

65.    The Bank and Magun Electric entered into a loan extension agreement, called a Change In Terms Agreement, effective October 16, 2009, which extended the Note and the Gunsteen Guaranty to January 30, 2010. (Stip. ¶ 15; JX 6.)

66.    The Loan ultimately matured on January 30, 2010. (Stip. ¶ 16.)

67.    As of September 11, 2012, there was due and owing under the Note $956,176.10 in principal, $213,189.01 in interest, $9,577.29 in late charges, and interest

- 15 -

continues to accrue at a per diem default rate of $199.20.  (Tr. 295:7-13; Tr. 295:24-296:4;

*see also* Stip. ¶ 19.)

68.     To date, Magun Electric has not paid the amount outstanding on the Note. (Stip.

¶ 20.)

69.     Neither Gunsteen nor the Co-Guarantor has made any payment under their

respective guarantees to pay off the Note. (Stip. ¶ 21.)

70.     Following trial the Bank and Gunsteen stipulated and agreed to the following

matters concerning the amount of Gunsteen's debt that would be non-dischargeable in the

event the Bank were successful in proving its claims to be nondischargeable:

    a.    The amount of Gunsteen's debt to the Bank that would be non-dischargeable is limited to the amount advanced less any collections received by the Bank, plus any accruals, including interest and late fees (11 A 1359, Dkt. 66)

    b.    As testified to by Derrick Foreman of the Bank, the amount of Gunsteen's debt that would be non-dischargeable as of September 11, 2012, would be comprised of $956,176.10 in principal (the amount advanced less any collections), $213,189.01 in interest, $9,577.29 in late charges, and a per diem rate of interest at $199.20.  (*Id.*)

    c.    Thus, the total amount of Gunsteen's debt that is non-dischargeable is $1,178,942.40, plus daily interest at the rate of $199.20 from September 11, 2012 through the date of judgment.  (*Id.*)

71.     The Bank seeks a Final Order:

    a.    Entering judgment against the Debtor, Debbie Gunsteen, in the amount of at lest $1,178,633.64, plus interest at a per diem rate of $199.20 through the date of judgment; and

    b.    Declaring that the foregoing judgment in the amount of $1,178,942.40, plus interest through the date of judgment, is non-dischargeable since it was obtained by fraud, false representation, false pretenses, and materially false writings pursuant to 11 U.S.C. § 523(a)(2)(B).

72.    Other facts set forth in the Conclusions of Law will stand as additional Findings

of Fact.

## CONCLUSIONS OF LAW

### Jurisdiction and Venue

Jurisdiction lies in this Adversary proceeding pursuant to 28 U.S.C. § 1334(b), in that

it arises in a case under Title 11. This matter is a core proceeding pursuant to 28 U.S.C.

§ 157(b)(2)(J).

Venue is proper in this Court pursuant to 28 U.S.C.§ 1409(a).

### Basis Asserted For Non-Dischargeability

Section 523(a)(2)(B) of the Code states, in pertinent part:

(a)      A discharge under section 727 ... of this title does not discharge an
individual debtor from any debt ... (2) for money, property, services or
an extension, renewal, or refinancing of credit, to the extent obtained
by-... (B) use of a statement in writing (I) that is materially false; (ii)
respecting the debtor's or an insider's financial condition; (iii) on which
the creditor to whom the debtor is liable for such money, property,
services, or credit reasonably relied; and (iv) that the debtor caused to be
made or published with intent to deceive[.] (Emphasis supplied.)

Accordingly, to prevail on a complaint under § 523(a)(2)(B), the statute requires that a

creditor must prove (1) the debtor made a statement in writing; (2) the statement was

materially false; (3) the statement concerned the debtor's financial condition; (4) the debtor

had an intent to deceive the creditor; and (5) the creditor actually and reasonably relied upon

the statement.

The Bank argues that it has proven these elements under a § 523(a)(2)(B) by a

preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991) ("For these

reasons, we hold that the standard of proof for the dischargeability exceptions in 11 U.S.C.

§ 523(a) is the ordinary preponderance-of-the-evidence standard.")

## Asserted Fraud in Connection with the 2009 Personal Financial Statement

The Bank has not established by a preponderance of the evidence that there was fraud

with respect to Gunsteen's 2009 Personal Financial Statement to satisfy the requirements of

§ 523(a)(2)(B). As shown by the Findings and as discussed below, the evidence has not

established that she wrote the line on page 2 of the Statement showing continued ownership of

the Vacation Property. Moreover, the Bank did not reasonably rely on that line because the

information on it was directly contradicted by correct information about the Gunsteen assets on

page 1 of the Statement which should have but did not prompt the Bank officials to inquire

further.

As more fully discussed below, Gunsteen did not obtain a renewal of the Loan by

submitting a materially false 2009 Financial Statement regarding her financial condition with

the intent to deceive the Bank, and the Bank did not reasonably rely on the questioned line on

page 2 of the 2009 Financial Statement to renew the Loan to Magun Electric.

## Credibility Determination of Debbie Gunsteen and Daniel Gunsteen

The Defendant called only two witnesses in this case: Debbie Gunsteen and Daniel

Gunsteen. Plaintiff argues that Debbie Gunsteens' testimony was not credible. Apart from

Plaintiff's credibility argument (discussed above and rejected) that in 2008 the Property value

- 18 -

had been reduced because the Gunsteens had promised to sell their the Property in the future,

it argues:

(a)     Gunsteen knowingly signed her husband's name on both the 2008 and
2009 Financial Statements, argued to be inconsistent with credibility.

(b)     Gunsteen's recollection surrounding the 2009 Personal Financial
Statement is said to be unclear.  On the one hand, she testified that she
did not complete the "848 Norwich Ct" entry on the 2009 Financial
Statement. On the other hand, she has given three "inconsistent"
statements throughout this case regarding how and where she completed
the 2009 Personal Financial Statement and how she delivered it to the
Bank:

(i)     Initially, in her answer to the Complaint she stated that
she handwrote the 2009 Financial Statement at the Bank.
(Tr. 168:6-21; Tr. 169:13-170:1; PX24.)

(ii)    Next, in response to an interrogatory, Gunsteen stated that
she completed the personal financial statement at home
and directly handed it to Mike Kowall at the Bank. (Tr.
170:3-25 PX 25.)

(iii)   Then at her deposition, she testified that she dropped off
the 2009 Financial Statement at the Bank in Barrington,
but Mike Kowall was not there. (Tr. 171:1-173:17; PX
22.)

(iv)    Now at trial, she has changed her testimony once again
believing that she delivered the 2009 Financial Statement
directly to Mike Kowall. (Tr. 167:2-23.)

Based on these supposedly "inconsistent" statements, Plaintiff argues that Gunsteen

either cannot recall the details of the 2009 Financial Statement or cannot keep her story

straight.  Plaintiff argues that Gunsteen's memory is clear when it's beneficial to her, and as a

result, she testified clearly and strongly that she did not include "848 Norwich Ct" on the 2009

Personal Financial Statement. Plaintiff calls this selective memory.  However, she has not

- 19 -

been inconsistent.  She has consistently said that she did not write the Line 2 disputed entry, and the different recollections of details as to delivery of the form are not implausible nor an indication of selective memory.

## THE GUNSTEEN DEFENSE

The heart of Gunsteen's defense as to the 2009 loan extension is three-fold:

First, that she did not write the words claimed as her false representation; second, that in light of accurate information on page 1 of the form the Bank was not deceived; and third, that in any case the Bank did not reasonably rely on the disputed words.  Analysis of these issues turns on close review of the evidence.

In a case of this nature, the objecting creditor has the burden to prove exceptions to discharge by a preponderance of the evidence.  *Grogan v. Garner*, 498 U.S. 279, 291.  Exceptions to discharge are construed strictly against a creditor and liberally in favor of the debtor. *Goldberg Secs., Inc. v. Scarlata (In re Scarlata)*, 979 F.2d 521, 524 (7th Cir. 1992).

## It was not Proven by Preponderance of Evidence that the Debtor Did Make the Statement in Issue

The Debtor denied in credible testimony that she wrote the statement in issue.  She acknowledges tendering the handwritten 2009 Personal Financial Statement (hereinafter the "PFS") to the Plaintiff. (Stip. ¶ 11).  But she denies writing the words *"848 Norwich Ct, Dan & Deb. 86, 18000. 425 000"*, on line 2 of Schedule D of the PFS. (Def.'s Answer ¶ 8, Tr 151: 19-23, 161: 20 -162: 3.)  Her husband also denied writing those words.

The Plaintiff's handwriting expert, Mr. Hayes found he could not conclude that she or her husband wrote those words,  He explained:

- 20 -

> " I have concluded that there are insufficient characteristics upon
> which to identify or eliminate Debbie Gunsteen [K-1] or Daniel
> Gunsteen [K-2] as having written the questioned entry 848
> Norwich Ct, Dan & Deb.86, 18000. 425 000", appearing on
> Exhibit Q-1, which is the 2009 Personal Financial Statement.
> (PX-19, at 3, ¶ 2.)

When asked on re-cross examination whether he still stood by that report he replied:

> "I don't think that there's anything that's been brought out that
> would have made me change my opinion. And I think I brought
> to the attention of the court all of the characteristics that ...
> provide the foundation for the conclusions I've rendered." (Tr
> 269: 4-11)

Mr. Hayes also found that the ink used in the questioned entry was different than the

ink used uniformly throughout other page 1 and page 2 entries. (Tr 245: 7-246:13, DX 1-3.)

Plaintiff's case depends on its contention that Mrs. Gunsteen used one pen to fill out the two

page form, and then (according to its handwriting expert) picked up a different pen to write the

questioned line on page 2 and did so in a different handwriting style than the rest of the form

that she wrote in order to deceive the Bank while seeking a loan renewal, a highly speculative

contention.

Whoever did write the words on Line 2 was not the person who did the math on page 1

of the PFS. The "$425,000" written in the "Market Value" space on Line 2 was not carried

forward to Page 1 of the PFS and was not included in the "real estate owned" line on page 1

or in any of the computations admitted to be written in the Debtor's hand on that page. On that

page 1 Gunsteen indicated that her "real estate owned' was worth only $389,000; her total

assets were only $489,000 and her net worth was (PX1, at 1) only $231,000. Page 1 did not

include the $425,000 of value assertedly written into a line on page 2 by Mrs. Gunsteen.

The only persons ever identified in this case as having physical access to the 2009 PFS were the Debtor (Stip. ¶ 13.), the Debtor's husband (Tr 323:2–324:1); the Bank relationship manager, Michael Kowall, and his assistant, Georgia Evenson. (Tr 38:12 -39:3)

The only two persons whose handwriting was examined and compared to the writing on Line 2 were the Debtor and her husband. (PX 19, at 1.)  The Bank did not ask its expert to examine the writing of its own employees.  The omission of the expert to do so is explained by the denial by Mr. Kowall that he altered the 2009 PFS. (Tr 40:1)

It was not the burden of Defendant to show who actually wrote Line 2.  It was the burden of Plaintiff to show by preponderance of evidence that Gunsteen wrote it. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). On the proof, Plaintiff rests its claim here for a nondischargeability judgment for over $1,000,000.  But in light of all the evidence, it is not found that Plaintiff met its burden.

## Debtor did not Deceive the Creditor

Even considering the disputed words on line 2 of the 2009 PFS, when taken as a whole, the documents identified a correct net worth that the Bank does not dispute.  The Debtor provided accurate statements of her assets and net worth on page 1 and those statements directly contradict the contents of line 2 that she denies writing.  Thus, the Debtor cannot be said to have intended to deceive or that she actually deceived the Bank.

## The Creditor did not Reasonably Rely on the Statement in Issue on Page 2

The Bank did not reasonably rely on inclusion of the Vacation Property on PFS page 2. The following evidence introduced at trial is relevant to this discussion:

- 22 -

a       Bank officials testified that all information obtained from a loan
        applicant would normally be used.  (Tr 95:24-25)

b.      Mr. Kowell was the only person who entered information into the
        Debtor's "personal financial analysis worksheet" for the Loan extension.
        (PX 5, Tr 80:713)

c.      To enter the information on PX 5 Mr. Kowall reviewed the Debtor's
        2009 PFS (Tr 80:21-81:2)

d.      Mr. Kowall reviewed page 1 of the 2009 PFS but chose to ignore
        its clear contents. "We will look at the summary for when there isn't
        (sic) items included on the Schedules . . . we look to see what's there
        versus what's in the schedule." (Tr 81:6-16)

e.      When questioned on cross as to why he ignored the Debtor's Statement
        of Real estate owned, Total assets and Net worth on page 1 of the PFS
        Mr. Kowell testified that: "There's adding errors that take place all the
        time ... Just -- we'll just go with what's in the detail on the schedules."
        (Tr 84:2-10)

f.      Mr. Kowall did not remember checking the net worth he calculated
        against the net worth stated by the Debtor on page 1 of the 209 PFS. (Tr
        88:17-21)

g.      Mr. Kowall did not know if there is a set practice for "... checking the
        personal financial statement versus what we come up with." (emphasis
        added) (Tr 88:1-3)

h.      The Bank only sends out an appraiser to value real estate which it holds
        as collateral. (Tr 88:8-11)

i.      When asked if the "personal financial analysis worksheet" took into
        account whether the Debtor had only a half interest in real estate, Mr.
        Kowall replied, ". . . we can net it out if we feel that's important." (Tr.
        89:1-3)

j.      Mr. Kowall apparently did not feel that how the Debtor held title to the
        property on Norwich Court was important, as he did not "net out" that
        factor.

k.      In the Debt Service Collateral Analysis section of PX 8 (used to evaluate
        Mrs. Gunsteen as a credit risk), there is no mention of the Vacation

Property, although there was extensive discussion of Mrs. Gunsteen's late payments on debt and the absence of the retirement funds from the 2009 PFS.

l.  Neither Mr. Weimer nor Ms. Williams ever saw or reviewed the 2009 PFS prior to the litigation. (Tr 118:12-15) (Tr 184: 14-17)

m.  Mr. Weimer and Ms. Williams only saw the PFS prior to litigation. (Tr 184:8-13) (Tr 123:6-9)

n.  Mr. Weimer approved the 90-day extension only with the information he was given and nothing more. (Tr 131 4-7)

Bank officers testified that they relied on the page 2 entry as to the Vacation Property despite contradictory information on page 1 without further inquiry of the Debtor. But it was not reasonable or even rational that they did so. If indeed they relied on it, that testimony does not make their reliance "reasonable" as required under 11 U.S.C. § 523(a)(2)(B).

The reasonableness of a creditor's reliance is determined on a case by case basis. *In re Bonnett*, 895 F.2d 155, 1157 (7th Cir. 1989). Seventh Circuit precedent recognizes that a judge should not "undertake a subjective evaluation and judgment of a creditor's lending policy and practices." *In re Garman*, 643 F.2d 1252, 1256 (7th Cir. 1980). Nor should the reliance requirement be used to "second-guess a creditor's lending decisions." *Shaw Steel, Inc. v. Morris (In re Morris)*, 223 F.3d 548, 553 (7th Cir. 2000). Furthermore, Seventh Circuit precedent states that "the concept of reasonable reliance does not generally require creditors to conduct an investigation prior to entering into agreements with prospective debtors." *Id.* at 554. A creditor may not, however, ignore evidence of untruthfulness with the expectation that an exception to a debtor's discharge be granted. *In re Bogstad*, 779 F.2d 370, 372 n.4 (7th Cir. 1985). An investigation is not generally required of creditors. *Morris*, 223

F.3d at 554. However, reliance may not be reasonable where a creditor "possesses information sufficient to call the representation into question." *Mayer v. Spanel Int'l, Ltd.*, 51 F.3d 670, 676 (7th Cir. 1995). In other words, the creditor cannot close its eyes to obvious red flags that should alert it. And there were several red flags in this case.

Plaintiff contends that it was reasonable to rely on page 2 without inquiring into the material contradictions with page 1.  Plaintiff thereby seeks to impose the burden of a permanent million dollar debt upon Defendant because they "relied" only on page 2 of a document, and disregarded the contradictions presented by correct information shown on page 1 of the same document.  It appears to have been slovenly and careless of the Bank rather than reasonable reliance when its officers closed eyes to truthful information and relied only on contradictory information written in different handwriting and different ink without requesting a rewritten and fully consistent document. *See also,  Midwest Bank & Trust Co. v. Barrata (In re Barrata)*, 272 B.R. 501, 506 (Bankr. M.D. Fla. 2001) (holding debt dischargeable where creditor-bank failed to investigate financial statement provided by debtor in seeking a loan because creditor's reliance was not reasonable under the circumstances when creditor-bank was alerted to debtor's financial difficulties and creditor did not investigate veracity of financial statement).

## Asserted Fraud in Connection with the 2008 Financial Statement

The Bank did not plead a cause of action as to the 2008 Financial Statement, but argues that a separate cause was established by a preponderance of the evidence showing that there was fraud in connection with Gunsteen's 2008 Financial Statement so as to satisfy the requirements of § 523(a)(2)(B) as to that Statement. The Debtor objects to the Bank's effort to

- 25 -

request a verdict based separately on the 2008 transaction since the Complaint only requested a

verdict based on the 2009 transaction.

The Bank rested its case without moving under Rule 15(b)(2) Fed. R. Civ. P. [Fed. R.

Bankr. P. 7015] to amend its Complaint to conform to the proofs, nor was any amendment to

the Complaint filed by it at any time. "The intent of Rule 15(b) is 'to provide maximum

opportunity for each claim to be decided on its merits rather than on procedural niceties.'"

*Matter of Prescott*, 805 F.2d 719, 725 (7th Cir. 1986) (quoting *Hardin v. Manitowoc-Forsythe*

*Corp.*, 691 F.2d 449, 456 (10th Cir. 1982)). Fed. R. Civ. P. 15(b) provides two situations in

which the pleadings can be amended during and after trial: (1) if at trial, a party attempts to

introduce evidence to support an unpleaded issue and the opposing party objects on the basis

that the proffered evidence is not within the issues raised in the pleadings and (2) if the

unpleaded issue is tried by the parties' express or implied consent. Fed. R. Civ. P. 15(b)(1),

(2). The former situation under Rule 15(b)(1), requires a specific objection at trial. The

ground for such objection must be that the proffered evidence is not within the issues made by

the pleadings. *WOW Logistics Co. v. Pro-Pac, Inc.*, 477 B.R. 92, 96 (E.D. Wis. 2012). No such

objection was made in this case.

Where an issue is fully and plainly tried without objection by any party, amendment of

a complaint may be invoked under Rule 15(b)(2). *See Torry v. Northrup Guinness Corp.*, 399

F.3d 876 (7th Cir. 2005). A motion to amend the pleadings to conform with the proofs is

unnecessary under Rule 15(b)(2), which requires the court to treat an unpleaded issue as if it

had been properly pleaded when the parties had either expressly or impliedly consented to trial

on the issue. Fed. R. Civ. P. 15(b)(2); *see Lerch v. City of Green Bay*, 406 F. App'x. 46, 47

(7th Cir. 2010) ("When a claim not raised in the complaint is briefed and decided without objection from the parties, we must treat that claim exactly as if it *had* been raised in the complaint."). Therefore, a court may enter judgment on an unpleaded claim even without a formal amendment to the pleadings so long as the parties expressly or impliedly consented to trial of the issue. *Torry v. Northrop Grumman Corp.* 399 F.3d 876, 879 (7th Cir. 2005); *Winger v. Winger*, 82 F.3d 140, 144 (7th Cir. 1996); *see also Walton v. Jennings Comm. Hosp., Inc.*, 875 F.2d 1317, 1320 n.3 (7th Cir. 1989) (approving of district court judge's *sua sponte* amendment of the pleadings to conform to the evidence as "fully consonent with the spirit of Rule 15(b)"). The precedent is therefore clear that no motion to amend pleadings is required before a court can rule on an unpleaded issue so long as the parties fully tried the issues without objection, sometimes called "implied consent."

However, merely because some evidence relevant to a pleaded claim incidentally tends to bear upon an unpleaded possible claim, such incidental evidence does not constitute trial of the unpleaded claim. *Ippolito v. WNS*, 864 F.2d 440 (7th Cir. 1988). If the 2008 Statement had been false, the issue here would turn on whether the unpleaded possible issue as to the 2008 transaction was fully tried so that no other substantial evidence would be needed to illuminate the issues, or whether there was merely some evidence that overlapped both the pleaded issues and unpleaded possible cause of action.The Bank now argues that all issues concerning the 2008 transaction were tried without objection and they proved Debtor's fraud through the application for original loan in that year.  It now argues it proved in evidence relevant to the Complaint that the Debtor did not disclose the oral promise for future sale of property to her family in her 2008 PFS, by way of supporting its case as to the 2009 PFS. It also argues it

proved that Gunsteen made a deliberately false statement regarding Daniel Gunsteen's signature on the 2008 Financial Statement with the intent to deceive the Bank so that it would rely on that statement and grant the Loan to Magun Electric

The test for whether a party impliedly consents to the trial of an unpleaded claim is "whether the opposing party had a fair opportunity to defend and whether he could have presented additional evidence had he known sooner the substance of the amendment." *Matter of Prescott*, 805 F.2d 719, 725 (7th Cir. 1986) (citation omitted) (finding implied consent where party knew prior to trial that the unpleaded issue would be raised and made no objections to improper pleading); *Torry*, 399 F.3d at 879 (finding implied consent where defendant went through four years of discovery without objecting to the plaintiff's apparent attempt to prove the unpleaded claim). Consent will not be found simply because evidence that was introduced in connection with a properly pleaded issue incidentally supports an unpleaded issue. *Ippolito v. WNS, Inc.*, 864 F.2d 440, 456 (7th Cir. 1988); *Rivinius*, 977 F.2d at 1176–77 (finding no implied consent when plaintiff raised a contribution theory after a bench trial and defendant had no reason to contest the share of its debt during trial). Even though unobjected-to evidence that incidentally proves a separate, unpleaded claim is not conclusive of implied consent, neither does it preclude such a finding. A court's determination that the parties expressly or impliedly consented to trial of an unpleaded issue is a legal question committed to the court's discretion. *Ippolito v. WNS, Inc.*, 864 F.2d 440, 456 (7th Cir. 1988); *see In re Rivinius Inc.*, 977 F.2d 1171 (7th Cir. 1992) (reviewing *de novo* bankruptcy court's finding of consent under Rule 15(b)).

In this case, there are three reasons to deny Plaintiff's contentions that the 2008

Statement was a fraud and evidence entirely proved a separate action to justify judgment:

First, the 2008 Statement did not misrepresent Property value or ownership, as

discussed below. Second, a full trial on an asserted fraud based on the 2008 Statement would

require evidence as to the actual Vacation Property value if asserted to be less than that

represented.  More evidence would also be needed to show all circumstances as to the promise

to sell and also to show materiality of the value in light of the Bank's disinterest in obtaining a

lien on the Property. Third, the Bank's post-trial argument that Gunsteen was deceptive in

obtaining credit from it by signing her husband's name on the PFS can be rejected on the basis

that Gunsteen did not deceive the Bank in any material way.

### *Ownership of Vacation Property and Its Value*

Their contention post trial is that since the Debtor and her husband agreed prior to the

2008 transaction to sell the Vacation Property to their son and daughter-in-law for an amount

that was paid prior to the 2008 PFS, but before title passed, the listing of the Property on the

2008 PFS was a fraud. It is undisputed that by submitting the 2008 Financial Statement to the

Bank in conjunction with obtaining the loan, Gunsteen made a statement in writing. (JX 4.) In

that writing, she represented under oath that the Gunsteens owned the Vacation Property, that

the Property was valued at $425,000, and that the 2008 Financial Statement was accurate.

(Stip. ¶¶ 8, 10; JX 4.)

Those representations concerning her financial condition were not false.  The

representation on the 2008 Financial Statement that she and her husband owned the Vacation

Property was true even though they had earlier promised to sell it in the future to their

- 29 -

children for up to $105,000, and even though they had already received the $105,000 by the time they provided the Bank the 2008 Financial Statement. The evidence supported the $425,000 Property value and no evidence was introduced to contradict that value. That value was not shown to have been reduced in fact or under law because of the oral promise to a future sale. The Bank could have required a mortgage or other interest in the Property before it agreed to the 2008 transaction, but did not do so. It can hardly argue that the subsequent transfer of title operated retrospectively to make the 2008 Statement inaccurate.

The difficulty with the Bank's logic is that title had not passed in that property before the 2008 transaction and the Gunsteens still owned the Property when the 2008 transaction took place. The $425,000 market value set out on the 2008 PFS is not questioned by evidence as the "Market Value" at that time. Mr. Daniel Gunsteen testified "That is what the property was worth at the time." The agreement to sell it to a child and daughter-in-law did not comprise a transaction that had been completed by transfer of title on any interest until after the 2008 transaction. At the time of the 2008 loan transaction, the information supplied as to value of the Property in issue here was accurate. The lack of Plaintiff's effort to secure a lien on the Property so as to prevent a future transfer of interest was an indication at the time that Plaintiff lacked any interest in treating the Property as collateral. At any event, the 2008 Statement was not proved to have been false in the Property value shown and relied on.

*Daniel Gunsteen's Signature*

It is further argued that Gunsteen made a deliberately false statement regarding Daniel Gunsteen's signature on the 2008 Financial Statement with the intent to deceive the Bank so that it would rely on that statement and grant the Loan to Magun Electric. 11 U.S.C.

- 30 -

§ 523(a)(2)(B)(iv).  Gunsteen did indeed show a reckless and casual attitude by deliberately

signing her husband's name even if he approved of her doing that.  But she did not guarantee

or expressly authenticate or identify his signature, and the purpose of both signatures was to

assure accurate representations of assets which were in fact accurately represented, so she did

not materially deceive the Bank when she signed her husband's signature on the 2008

Financial Statement. (The same reasoning applies to her signing of her spouse's signature on

the 2009 document).

Therefore, it was not established that Gunsteen obtained an extension of credit, *i.e.,* the

original Loan, by submitting a false 2008 Financial Statement regarding her financial condition

with intent to deceive the Bank.

## CONCLUSION

Accordingly, Gunsteen's liability to the Bank, under the 2008 Statement has not been

fully tried or proven, and nondischargeability of her liability under the 2009 Statement has not

been established.  Therefore, her debt to the Bank will by separate Judgment Order be

adjudged dischargeable, and the Plaintiff will recover nothing by this action.

ENTER

Jack B. Schmetterer
United States Bankruptcy Judge

Dated this 8th day of February 2013.

- 31 -

## CERTIFICATE OF SERVICE

I, Dorothy Clay certify that on February ____, 2013, I caused to be served copies of the

foregoing Order to the following by electronic service through the Court's CM/ECF system or

regular U.S. mail:

_____

Judicial Assistant/Deputy Clerk

### Electronic Service through CM/ECF System

Maria A Diakoumakis
Heather L Kramer
Courtney M Ofosu
Edward S Weil
Dykema Gossett PLLC
10 S. Wacker Dr. Suite 2300
Chicago, IL 60606
Counsel for Plaintiff

John S Biallas
John S. Biallas, Attorney At Law
3N918 Sunrise Lane
St Charles, IL 60174
Counsel for Defendant